831 P.2d 541

Marlene CURTIS, Individually, and as Personal Representative of the Estate of Jon Curtis, and as Natural Parent and Legal Guardian of their Minor Children, Kellie Michelle Curtis and Zane Anthony Curtis, Plaintiffs–Appellants–Cross Respondents,

v.

CANYON HIGHWAY DISTRICT NO. 4, an Independent Political Subdivision of the State of Idaho, Defendant–Respondent–Cross Appellant.

No. 18986.

Supreme Court of Idaho,
Boise, February 1992 Term.

April 22, 1992.

---

Comstock & Bush, Boise, for plaintiffs-appellants-cross respondents. John A. Bush argued.

Saetrum & Day, Boise, for defendant-respondent-cross appellant. David E. Day argued.

McDEVITT, Justice.

### Background

This case arises from the death of appellant-cross-respondent's (Marlene Curtis) husband, Mr. Jon Curtis, on February 16, 1988. Mr. Curtis was killed when the vehicle he was driving collided with a Union Pacific train at a crossing maintained by respondent-cross appellant, Canyon Highway District No. 4. Appellant commenced wrongful death actions against Union Pacific Railroad and respondent.

### Prior Proceedings

Appellant's action against Union Pacific was tried in the United States District Court. Prior to the submission of the case to the jury, appellant and Union Pacific reached a settlement. The terms of the settlement required Union Pacific to pay $310,000.00 to appellant. This settlement was written and executed in December of 1989.

The action against respondent was filed in the District Court of the Third Judicial District of the State of Idaho, in and for the County of Canyon, on March 20, 1989. In her complaint, appellant listed three causes of action; Count One, respondent was negligent in failing to adequately repair or remedy the condition of the crossing, Count Two, respondent was negligent *per se* because I.C. § 49–672 requires stop signs at crossings, and, Count Three, respondent was negligent in failing to comply with the guidelines, regulations, or policies of the Idaho Department of Transportation. Appellant also requested attorney fees and prayed for damages for loss of consortium, lost future earnings, and medical and funeral expenses.

Respondent filed its answer on April 5, 1989. In the answer, respondent listed a series of affirmative defenses, including contributory negligence.

Following motions for summary judgment and motions in limine, the matter proceeded to a jury trial on July 2, 1990. After the testimony and argument, the jury returned a special verdict on July 12, 1990. In the special verdict, the jury found respondent, Union Pacific, and decedent to be negligent, that each party's negligence was a proximate cause of the accident, and that total economic damages were $395,000.00, while total non-economic damages were $100,000.00. Specifically, the jury found the decedent to be 25% at fault, Union Pacific to be 30% at fault, and respondent to be 45% at fault.

The district court entered its order on August 23, 1990. In relevant part, the order stated:

> Prior to trial in this case the [appellants] settled with the Union Pacific Railroad for the total amount of $310,000.00. [Appellants] contends that the [respondent] highway district is not entitled to

offset this settlement against the award notwithstanding the provisions of § 6–805, Idaho Code.

While the [appellant] makes some strong arguments based primarily upon New Mexico case law which discuss policy questions; this court cannot find that the Idaho Legislature intended to do away with offsets when it repealed the contribution amount joint tortfeasors law but left § 6–805 intact.

Accordingly the court finds that after applying 75% of the causative negligence found by the jury to be attributed to the [respondent] and the Union Pacific Railroad to the total damage verdict, or 75% of $495,000.00 ($371,250.00), that the settlement of $310,000.00 must be offset against that amount and that judgment should enter against the [respondent] in the amount of $61,250.00.

On August 30, 1990, appellant filed an affidavit and memorandum of costs, disbursements and attorney fees. Appellant represented her total costs and disbursements to be $39,290.07, and her attorney fees to be $85,216.50. On September 13, 1990, respondent moved the court to disallow these costs, disbursements, and attorney fees.

On September 17, 1990, the district court entered its judgment upon verdict. In the September 17 judgment, the court awarded appellant $61,250.00.

On October 18, 1990, the district court entered its order on the costs memorandum. In the October 18 order, the court found appellant's total allowable costs to be $4,866.90. Subsequently, appellant filed a motion for reconsideration of the order on costs. The motion was filed pursuant to I.R.C.P. 11(a)(2)(B) and 54(d)(1)(D), and it was supported by an affidavit from appellant's attorney. This motion was denied by order dated March 12, 1991.

On October 25, 1990, the district court entered its first amended judgment. In the first amended judgment, the court awarded

appellant $66,116.90—$61,250.00 representing the amount specified in the August 23rd order, and $4,866.90 representing the amount specified in the October 18th order.

Appellant filed her notice of appeal on October 29, 1990. She appealed pursuant to I.A.R. 11(a)(1) "from the Judgment filed September 17, 1990." [1] Respondent filed its notice of cross-appeal on November 9, 1990. It cross-appealed "from the Judgment Upon Verdict, entered September 17, 1990, and the First Amended Judgment, entered October 25, 1990."

On January 9, 1991, respondent filed a notice of payment of judgment. In the notice of payment of judgment, respondent stated that it had tendered a check for $66,116.90 to appellant immediately upon receipt of the first amended judgment, and that appellant had refused to accept the check. The payment was made pursuant to I.C. § 10–1115, and the respondent requested the clerk to release and satisfy the first amended judgment. The clerk acknowledged receipt of the check and deposited it in a non-interest-bearing trust account.

On January 10, 1991, appellant objected to respondent's notice of payment of judgment. Appellant's objection was that "the proposed payment and Release and Satisfaction does not include interest from the date of judgment as set forth in Idaho Code section 28–22–104."

Respondent filed a response to the objection on January 14, 1991. Respondent asserted that I.C. § 10–1115 governs the procedure, that "tender of payment precludes accrual of interest on the Judgment," and that the "Clerk of the Court is, therefore, required by statute to release and satisfy the Judgment."

On February 12, 1991, the parties stipulated to the deposit of the check proceeds into an interest-bearing account. On February 13, 1991, the district court entered an order carrying out this stipulation. The order directed the clerk to deposit the

---

**1.** Idaho Appellate Rule 17(e)(1)(C) reads: "The notice of appeal shall designate the final judgment, order or decree appealed from which shall be deemed to include, and present on appeal ... [a]ll interlocutory or final judgments, orders and decrees entered after the judgment, order or decree appealed from."

check into an interest-bearing account "without prejudice to either party with regard to the pending appeals, and further without prejudice to either party with regard to Plaintiff's Objection to Notice of Payment of Judgment and Defendant's Response thereto on file herein."

The issues on appeal are:

Appellant Curtis asks:

I. Did the district court err when it reduced the total jury verdict, less the amount representing decedent's negligence, by the amount of the Union Pacific settlement?

II. If the district court was correct, did it then err by not adding the attorney fees and costs incurred in reaching the Union Pacific settlement?

III. Did the district court err in disallowing certain costs claimed by appellant?

IV. Is respondent required to pay statutory interest on the judgment during the pendency of this appeal?

Cross–Appellant Canyon Highway District asks:

V. Did the district court err by instructing the jury that respondent was required to place a stop sign at the crossing?

VI. Did the district court err by giving negligence *per se* instructions with respect to pavement markings, stop ahead signs, and portable stop signs?

VII. Did the district court err by not allowing the Union Pacific complaint

to be used as evidence of prior admissions and for impeachment purposes?

VIII. Did the district court err by excluding evidence of the Union Pacific settlement?

IX. Did the district court err by excluding evidence of appellant's mitigation of economic damages?

X. Is respondent entitled to attorney fees, pursuant to I.C. § 12–121 and I.A.R. 41, for having to defend this appeal?

### I.

Did The District Court Err When It Reduced The Total Jury Verdict, Less the Amount Representing Decedent's Negligence, By The Amount Of The Union Pacific Settlement?

The thrust of appellant's argument is that when the Idaho legislature abolished joint and several liability in 1987[2], as it would have applied to this action, I.C. § 6–805, as it existed then[3], was impliedly repealed. In support of her argument, appellant cites from New Mexico and Pennsylvania. The New Mexico and Pennsylvania courts held that the prior abolition of the doctrine of joint and several liability also eliminated the type of contribution enunciated in former I.C. § 6–805. *Wilson v. Galt*, 100 N.M. 227, 668 P.2d 1104 (Ct.App. 1983), *cert. quashed*, 100 N.M. 192, 668 P.2d 308; *Charles v. Giant Eagle Markets*, 513 Pa. 474, 522 A.2d 1 (1987). Appellant urges that her argument would further the public policy favoring amicable settlement

---

**2.** An Act Relating To Tort Liability Laws, ch. 278, § 4, 1987 Idaho Session Laws 571, 577–78.

**3.** I.C. § 6–805 was amended, by adding subsection (2), in 1991. The statute presently reads:
   **6–805. Effect of release of one tortfeasor on liability of others.**—(1) A release by the injured person of one (1) joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but, unless otherwise provided in subsection (2) of this section, reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if such amount or proportion is greater than the consideration paid.

(2) A release by the injured person of one (1) or more tortfeasors who are not jointly and severally liable to the injured person, whether before or after judgment, does not discharge another tortfeasor or reduce the claim against another tortfeasor unless the release so provides and the negligence or comparative responsibility of the tortfeasor receiving the release is presented to and considered by the finder of fact, whether or not the finder of fact apportions responsibility to the tortfeasor receiving the release.

The appellant did not argue that the amended version of I.C. § 6–805 should be applied retroactively.

of litigation. *See Lomas & Nettleton Co. v. Tiger Enter., Inc.,* 99 Idaho 539, 542, 585 P.2d 949, 952 (1978).

Respondent contends that former I.C. § 6–805 is clear and unambiguous and was not impliedly repealed by the 1987 limited abolition of joint and several liability. Respondent cites several cases it argues support the district court's method of arriving at appellant's damage award, in particular, the Idaho cases of *Quick v. Crane,* 111 Idaho 759, 727 P.2d 1187 (1986), and *Tucker v. Union Oil Co. of California,* 100 Idaho 590, 603 P.2d 156 (1979).

In *Quick,* this Court was faced with the issue of "[w]hether the trial court erred in its method of crediting certain amounts Crane received in settlements against his total verdict." *Quick,* 111 Idaho at 763, 727 P.2d at 1191. "The trial court concluded that the verdict should be credited for either the total amount of settlement actually received by Crane or the proportionate share of negligence borne by Crane and the parties with whom he settled, whichever was greater." *Quick,* 111 Idaho at 782, 727 P.2d at 1210. This Court stated:

> We have reviewed the case law in other jurisdictions operating under statutes similar to that of Idaho. Our search reveals that the more widely accepted view is that under provisions such as I.C. § 6–805, the amount a plaintiff receives in settlement from a party should be deducted from the plaintiff's judgment even though the settling party was never judicially determined technically to be a joint tortfeasor.

*Quick,* 111 Idaho at 783, 727 P.2d at 1211.

In *Tucker,* this Court was faced with the issue of "whether, in the context of an industrial accident and where the employer has been found to be negligent, this Court should adopt a doctrine of comparative fault. That doctrine would require a third-party tortfeasor to respond in damages only in the ratio which its negligence bears to all other negligent conduct by others." *Tucker,* 100 Idaho at 592, 603 P.2d at 158. This Court stated that "[a]t this time at least, the adoption of our comparative negligence act in Idaho does not require and

we do not deem it appropriate to find a legislative intent to so abolish joint and several liability." *Tucker,* 100 Idaho at 598, 603 P.2d at 164. The Court did, however, remand *Tucker,* finding "[t]he defendant-appellant Collier Carbon is entitled to have the judgment against it reduced by the amount of work[er's] compensation benefits paid to [plaintiff-respondent] Tucker." *Tucker,* 100 Idaho at 604, 603 P.2d at 170.

Both the *Tucker* and the *Quick* cases were decided before the legislative abolition of joint and several liability. Because of this, the question we must answer is whether the legislature, by adopting the 1987 amendments to I.C. § 6–803, impliedly repealed I.C. § 6–805.

For this question, we turn to *State v. Martinez,* 43 Idaho 180, 187, 250 P. 239, 240 (1926):

> The rule applicable in this instance is well expressed in Ruling Case Law:
>
> 'Repeals by implication are not favored, and will not be indulged if there is any other reasonable construction....
>
> 'The rule of construction in respect to the repeal of the statutes by implication is, that the earlier act remains in force, unless the two are manifestly inconsistent with and repugnant to each other, or unless in the later act express notice is taken of the former, plainly indicating an intention to abrogate it....
>
> 'To effect an implied repeal of one statute by another they must both relate to the same subject and have the same object or purpose. Where there is a difference in the whole purview of two statutes apparently relating to the same subject, the former is not repealed. Where the evils which an act is designed to remedy are different from those for which a prior act provides the prior act is not repealed.'

Our task then, as *Martinez* dictates, becomes a twofold inquiry: (1) Whether I.C. § 6–803, as amended in 1987, and former I.C. § 6–805 are "manifestly inconsistent with and repugnant to each other," and (2) whether in I.C. § 6–803, as amended in 1987, "express notice is taken of" former I.C. § 6–805.

The language of I.C. § 6–805, as it read before its 1991 amendments, was:

**6–805. Effect of release of one tortfeasor on liability of others.**—A release by the injured person of one (1) joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if such amount or proportion is greater than the consideration paid. [1971, ch. 186, § 5, p. 862.]

The language of former I.C. § 6–805 operates to set a cap on the total amount of damages a tort plaintiff can recover from multiple tort-feasors. For example, plaintiff ("P") is injured by the fault of defendants 1 ("D1") and 2 ("D2"). P files a complaint against D1 and D2. Prior to trial, P settles with D1 for $4,000.00, and P then proceeds to trial against D2. After trial, the jury returns a special verdict, finding P to be 20% negligent, D1 to be 30% negligent, and D2 to be 50% negligent. The jury also finds P's total damages to be $10,000. After reducing the total damages by P's share of the fault, former I.C. § 6–805 requires that this amount ($8,000.00) be reduced by the "amount paid for the release." Thus, P's recovery against D2 would be $4,000. Former I.C. § 6–805 thus sets the "cap" at the amount of the total jury verdict, *i.e.*, a tort plaintiff can never recover more than the total jury verdict from multiple defendants under former I.C. § 6–805.

The pertinent language of the 1987 amendment to I.C. § 6–803 reads:

(3) The common law doctrine of joint and several liability is hereby limited to causes of action listed in subsections (5), (6) and (7) of this section. In any action in which the trier of fact attributes the percentage of negligence or comparative responsibility to persons listed on a special verdict, the court shall enter a separate judgment against each party whose negligence or comparative responsibility exceeds the negligence or comparative

responsibility attributed to the person recovering. The negligence or comparative responsibility of each such party is to be compared individually to the negligence or comparative responsibility of the person recovering. Judgment against each such party shall be entered in an amount equal to each party's proportionate share of the total damages awarded.

Thus, I.C. § 6–803, as amended in 1987, operates to set a cap on the total amount of damages recoverable against an individual defendant. In the above example, say that D1 settled with P for $1,000.00 instead of $4,000.00. Leaving the percentages of fault the same, former I.C. § 6–805 would require that the total verdict ($10,000.00) be reduced by P's fault ($2,000.00) and by D1's settlement ($1,000.00). Thus, there would be $7,000.00 left for P to potentially recover from D2. However, under I.C. § 6–803, as amended in 1987, "[j]udgment against each such party shall be entered in an amount equal to each party's proportionate share of the total damages awarded." Therefore, P could recover no more that D2's proportionate share (50%) of $10,-000.00, or $5,000.

The statutes in question, I.C. § 6–803, as amended in 1987, and I.C. § 6–805, as it read before its 1991 amendments, are not "manifestly inconsistent with and repugnant to each other."

Looking again to the particular language of I.C. § 6–803, as amended in 1987, there is no "express notice" taken of former I.C. § 6–805.

Therefore, we hold that the legislature, in amending I.C. § 6–803 in 1987, did not impliedly repeal former I.C. § 6–805. We conclude that the district court, pursuant to former I.C. § 6–805, correctly subtracted the amount appellant received in settlement from Union Pacific from the total jury verdict rendered against respondent.

## II.

If The District Court Was Correct, Did It Then Err By Not Adding The Attorney Fees And Costs Incurred In Reaching The Union Pacific Settlement?

■ Appellant argues that the fees expended in arriving at the Union Pacific

settlement should be subtracted from that settlement amount. Thus, only the "net" amount received in settlement would be subtracted from appellant's award in this case.

We find no authority for this proposition.

## III.

### Did The District Court Err In Disallowing Certain Costs Claimed By Appellant?

■ Appellant challenges the district court's disallowance of certain costs, as listed in her affidavit and memorandum of costs, disbursements, and attorney fees. Appellant also argues that the district court erred by not allowing her to amend the affidavit and memorandum of costs, disbursements, and attorney fees. Additionally, appellant argues that the district court failed to make express findings of why the costs were not allowed.

The costs that the district court denied were costs in excess of those allowed as a matter of right. I.R.C.P. 54(d)(1)(D) allows for costs in excess of those allowed as a matter of right "upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party. The trial court, in ruling upon objections to such discretionary costs contained in the memorandum of costs, shall make express findings as to why such specific item of discretionary cost should or should not be allowed."

In *Masters v. Dewey*, 109 Idaho 576, 580, 709 P.2d 149, 153 (Ct.App.1985), *review denied*, the district court "awarded $1,265.55 for costs as a matter of right and $815 discretionary costs to the [respondents].... The record merely reflects that the [respondents] were awarded all but $65.00 of their costs." The Court of Appeals stated that "the district court should have explicitly stated which costs were recoverable under rule 68 and which costs were recoverable under rule 54(d)(1), together with a statement of reasons supporting award of any discretionary costs under rule 54 ...," and, thus, the Court of Appeals remanded the case "for a determi-

nation of costs consistent with this opinion." *Masters*, 109 Idaho at 580, 709 P.2d at 153.

The district court, in its October 18, 1990 Order On Costs Memorandum, made the following statements in regard to the disallowed costs:

2. Under "witness fees" [subheading in cost memorandum] is a claim of $200.00 for David Beaufont who is not included under "expert witness fees." The same is true of Ken Cottingham ($140.00) and David Putnam ($75.00). There is no showing of the mileage travelled by the witnesses and the amount allowable for non-expert witnesses in $20.00 per day. Accordingly the Court finds that the total cost allowable for the eleven non-expert witnesses who are listed in $220.00.

3. As to the expert witness costs, the court finds that the amount allowable as a matter of right under the rule is $500.00 per witness, plus mileage. The mileage travelled is again not stated. There is no showing that the costs claimed in excess of $500.00 are exceptional in a case of this nature. The court therefor finds that the sum of $2,000.00 is allowable for the four named expert witnesses.

.     .     .     .     .

5. The claim for a total of $1,329.50 for transcripts of the testimony from the plaintiff's prior trial in which the Union Pacific Railroad was the defendant is denied as not being necessary since these are mostly, if not entirely, the plaintiffs own witnesses.

6. Plaintiff's exhibit expenses in excess of the amount of $500.00 have not been shown to be exceptional and such allowable expenses are therefor limited to $500.00.

7. Plaintiff's claims for travel expenses of counsel in taking depositions and claims for miscellaneous expenses have not been shown to be exceptional and should not be allowed.

The district court, in ruling upon respondent's September 13, 1990 motion to disallow appellant's claimed costs, clearly made

"express findings as to why such specific item of discretionary cost ... should not be allowed," I.R.C.P. 54(d)(1)(D). *Masters v. Dewey,* 109 Idaho 576, 709 P.2d 149 (Ct. App.1985), *review denied.*

### IV.

### Is Respondent Required To Pay Statutory Interest On The Judgment During The Pendency Of This Appeal?

■ Appellant contends that she is entitled to receive post-judgment interest on the district court's judgment because respondent's cross-appeal involves the possibility of a new trial. For authority, she cites *Long v. Hendricks,* 117 Idaho 1051, 793 P.2d 1223 (1990), and I.C. § 10–1115.

Our rule is clear: "When a judgment debtor wishes to cut off the accrual of post judgment interest, the tender of the amount of the judgment is sufficient." *Long,* 117 Idaho at 1054, 793 P.2d at 1226. The record shows that respondent tendered the amount of the judgment to appellant, thus complying with I.C. § 10–1115, appellant refused to accept the tender, and the parties later stipulated to the deposit of the check into an interest-bearing account. This having satisfied the *Long* rule, respondent is not required to pay statutory interest on the judgment during the pendency of this appeal.

### V.

### Did The District Court Err By Instructing The Jury That Respondent Was Required To Place A Stop Sign At The Crossing?

■ The district court gave a negligence *per se* instruction based upon I.C. § 49–672. Cross-appellant contends that I.C. § 49–672 is in direct conflict with another statute, I.C. § 49–584.

Idaho Code § 49–672 was amended and recodified at I.C. § 49–202(21). An Act Relating To Recodification Of The Motor Vehicle Laws, ch. 265, § 5, 1988 Idaho Session Laws 549, 576. The language of former I.C. § 49–672 read:

**49–672. All vehicles must stop at certain grade crossings.**—Wherever a street or highway crosses or shall hereaf-

ter cross one or more railroads at grade, the Idaho transportation department as to streets or highways under its jurisdiction and local authorities as to streets and highways under the jurisdiction of such local authorities shall place and maintain stop signs, directing vehicular traffic approaching the crossing to come to a full stop prior to entering the crossing at all railroad crossings where electric or mechanical warning signals do not exist. Placement of such stop signs shall be mandatory except when in the determination of the Idaho transportation department or local authorities as to the streets or highways under its or their respective jurisdiction the existence of stop signs at a given crossing would constitute a greater hazard than their absence, mandatory placement shall be deemed waived. When such stop signs are erected, the driver of any vehicle shall stop within fifty (50) feet but not less than fifteen (15) feet from the nearest rail of such railroad and shall proceed only upon exercising due care.

Provided, however, that nothing in this section shall be construed as granting immunity to any railroad company as to liability, if any, for an accident which might occur at a crossing where stop signs are erected and in place, but such liability, if any, shall be determined as by law provided. Provided, further, that liability on the part of the governmental authorities on account of the absence of any stop sign at a crossing shall be determined as provided by law.

Idaho Code § 49–584 was amended and recodified at I.C. § 49–201(3). An Act Relating To Recodification Of The Motor Vehicle Laws, ch. 265, § 4, 1988 Idaho Session Laws 549, 571. The language of former I.C. § 49–584 read:

**49–584. Board of transportation to adopt sign manual.**—The Idaho transportation board shall adopt a manual and specifications for a *uniform system of traffic-control devices consistent with the provisions of this title* for use upon highways within this state. Such uniform system shall correlate with, and so

far as possible, conform to the system set forth in the most recent edition of the manual on uniform traffic control devices for streets and highways and other standards issued or endorsed by the federal highway administrator.

(Emphasis added.)

The Idaho Transportation Board, pursuant to the directive of I.C. § 49–584, adopted the Manual On Uniform Traffic Control Devices (MUTCD). On April 10, 1980, they readopted the MUTCD. It is the 1980 version of MUTCD that is at question.

The relevant provisions of the MUTCD appear at Part VIII, which is entitled "Traffic Control Systems For Railroad—Highway Grade Crossings." The relevant provision of Part VIII of the 1980 MUTCD is:

### 8B–9 STOP Signs at Grade Crossings (R1–1, W3–1)

The use of the STOP signs at railroad-highway grade crossings shall be limited to those grade crossings selected after need is established by a detailed traffic engineering study. Such crossings should have the following characteristics:

1. Highway should be secondary in character with low traffic counts.

2. Train traffic should be substantial.

3. Line of sight to an approaching train is restricted by physical features such that approaching traffic is required to reduce speed to 10 miles per hour or less in order to stop safely.

4. At the stop bar, there must be sufficient sight distance down the track to afford ample time for a vehicle to cross the track before the arrival of the train.

The engineering study may determine other compelling reasons for the need to install a STOP sign, however, this should only be an interim measure until active traffic control signals can be installed. STOP signs shall not be used on primary through highways or at grade crossings with active traffic control devices.

Whenever a STOP sign is installed at a grade crossing, a Stop Ahead sign shall be installed in advance of the STOP sign.

Cross-appellant contends that former I.C. § 49–672 is in conflict with former I.C. § 49–584. Further, cross-appellant contends that the MUTCD, which was adopted pursuant to former I.C. § 49–584, requires four findings before a stop sign is required, and that those findings were not made in this case.

Former Idaho Code § 49–672 and former I.C. § 49–584 both deal with state regulation of traffic control devices. Therefore, the statutes are *in pari materia*. *Meyers v. City of Idaho Falls*, 52 Idaho 81, 89–90, 11 P.2d 626, 629 (1932). As such, "we are required to construe the language of [former I.C. § 49–672] as being consistent with the language of [former I.C. § 49–584], if such construction is at all possible." *State v. Creech*, 105 Idaho 362, 367, 670 P.2d 463, 468 (1983), *cert. denied* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (citing *Union Pac. R.R. Co. v. Board of Tax Appeals*, 103 Idaho 808, 654 P.2d 901 (1982)).

Former I.C. § 49–672 *mandates* the placement of stop signs at railroad crossings "[w]herever a street or highway crosses or shall hereafter cross one or more railroads at grade." This statute provides an exception to this mandatory rule for situations where "the existence of stop signs at a given crossing would constitute a greater hazard than their absence."

Former I.C. § 49–584 mandates the Idaho Transportation Board to "adopt a manual and specifications for a uniform system of traffic-control devices *consistent* with the provisions of this title for use upon highways within this state." (Emphasis added.)

Section 8B–9 of the MUTCD *limits* the placement of stop signs at railroad crossings to those crossings found, after a "detailed engineering study," to possess four specified characteristics.

In order for an administrative regulation to be valid, it must be adopted pursuant to authority granted to the adopting body by the legislature. *Grayot v. Summers*, 75 Idaho 125, 132, 269 P.2d 765, 769 (1954). In this case, former I.C. § 49–584 authorized the Idaho Transportation Board to "adopt a manual and specifica-

tions for a uniform system of traffic-control devices...." Additionally, an administrative regulation cannot exceed the bounds of the authority granted to the adopting body by the legislature. *Pumice Prods. v. Robison*, 79 Idaho 144, 147, 312 P.2d 1026, 1027 (1957). In this case, the legislature defined the precise limits of the authority granted in former I.C. § 49–584 as *"consistent* with the provisions of this *title* for use upon highways within this state." (Emphasis added.)

Former I.C. § 49–672 states that "[w]herever a street or highway crosses or shall hereafter cross one or more railroads at grade, [the proper governmental body] *shall* place and maintain stop signs...." (Emphasis added.) The term "shall" is not defined in chapter 6 of title 49, Idaho Code. However, this Court has clearly held that "[t]he word *shall,* when used in a statute, is mandatory." *Goff v. H.J.H. Co.*, 95 Idaho 837, 839, 521 P.2d 661, 663 (1974) (emphasis in original). Furthermore, at the same time former I.C. § 49–672 was in effect, former I.C. § 49–601 specifically stated that "[t]he provisions of this *title* relating to the operation of vehicles refer exclusively to the operation of vehicles *upon highways* except where a different place is specifically referred to in a given section." (Emphasis added.) In this case, former I.C. § 49–672 does not specifically refer to "another place."

The relevant MUTCD provision, § 8B–9, requires a finding of four necessary characteristics before a stop sign is placed at railroad crossings. Section 8B–9 of the MUTCD is, then, manifestly inconsistent with the mandatory stop sign provision of former I.C. § 49–672. Because of this inconsistency, § 8B–9 of the MUTCD is violative of the provision of the enabling act, former I.C. § 49–584, requiring the manual to be "consistent with the provisions of this title...."

We therefore hold that § 8B–9 of the MUTCD is not authorized by former I.C. § 49–584, is beyond the authority of the Idaho Transportation Board, and is, therefore, void. *Pumice Prods.*, 79 Idaho at 147, 312 P.2d at 1027. We conclude that

the district court properly instructed the jury that the respondent was required to place a stop sign at the crossing.

## VI.

Did The District Court Err By Giving Negligence *Per Se* Instructions With Respect To Pavement Markings, Stop Ahead Signs, And Portable Stop Signs?

■ The district court gave the jury the following instruction:

You are instructed that, pursuant to a statutory requirement, the Idaho transportation board has adopted the Manual on Uniform Traffic Control Devices for Streets and Highways [the MUTCD], which has the force and effect of law. You are further instructed that local authorities such as Canyon Highway District No. 4 are also required by statute to adopt the MUTCD and to comply with the provisions thereof.

At the time of the accident in question, Provision 8B–4 of the MUTCD provided that:

Pavement markings in advance of a grade crossing shall consist of an X, the letters RR, a no passing marking on two lane roads, and certain transverse lines. Identical markings shall be placed in each approach lane on all paved approaches to grade crossings where grade crossing signals or automatic gates are located, and at all other grade crossings where the prevailing speed of highway traffic is 40 mph or greater.

The markings shall also be placed at crossings where the engineering studies indicate there is a significant potential conflict between vehicles and trains. At minor crossings or in urban areas, these markings may be omitted if engineering study indicates that other devices installed provide suitable control.

Provision 8B–9 of the MUTCD provided in pertinent part that: "Whenever a STOP sign is installed at a grade crossing, a Stop Ahead sign shall be installed in advance of the STOP sign."

Yet another provision of the MUTCD, 3B–17, provided that:

Stop lines are solid white lines, normally 12 to 14 inches wide, extending across all approach lanes.

Stop lines should be used in both rural and urban areas where it is important to indicate the point, behind which vehicles are required to stop, in compliance with a STOP sign or other legal requirement.

Stop lines, where used, should ordinarily be placed 4 feet in advance of and parallel to the nearest crosswalk line. In the absence of a marked crosswalk, the Stop line should be placed at the desired stopping point, in no case no more than 30 feet or less than 4 feet from the nearest edge of the intersecting roadway.

If a stop line is used in connection with a STOP sign, it should ordinarily be placed in line with the STOP sign. However, if the sign cannot be located exactly where vehicles are expected to stop, the Stop line should be placed at the stopping point.

.MUTCD Provision 2B–5 provided that: "Portable or part-time STOP signs shall not be used except for emergency purposes."

Failure of a local authority to comply with any of these provisions is negligence unless compliance with the MUTCD provision was impossible, or something over which the authority had no control placed it in a position of non-compliance, or an emergency not of the authority's own making caused it to fail to comply with the provision.

Former I.C. § 49–586, as it existed at the time of the accident in this case, stated:

**49–586. Local traffic-control devices.**—Local authorities in their respective jurisdictions shall place and maintain such traffic-control devices upon highways under their jurisdiction as they may deem necessary to indicate and to carry out the provisions of this title, or local traffic ordinances, or to regulate, warn or guide traffic. All such traffic-control devices hereinafter erected shall conform to the state manual and specifications referred to in section 49–584, Idaho Code.

The relevant MUTCD provisions do not conflict with former I.C. § 49–586.

Respondent argues that since there was no stop sign at the crossing, the MUTCD did not require it to place a stop ahead sign at the crossing. We have already held that former I.C. § 49–672 required a stop sign at this crossing. Furthermore, this Court has held that the MUTCD "has the force of law." *Bingham v. Idaho Dep't of Transp.*, 117 Idaho 147, 151, 786 P.2d 538, 542 (1989) (citing *Jorstad v. City of Lewiston*, 93 Idaho 122, 129–30, 456 P.2d 766, 773–74 (1969)).

This Court has recognized that a violation of an administrative regulation "may constitute negligence *per se.*" *Sanchez v. Galey*, 112 Idaho 609, 617, 733 P.2d 1234, 1242 (1986).

The district court did not err in giving the jury the above-quoted instruction regarding stop ahead signs, stop lines, and portable stop signs.

VII.

Did The District Court Err By Not Allowing The Union Pacific Complaint To Be Used As Evidence Of Prior Admissions And For Impeachment Purposes?

■ Cross-appellant contends that the complaint filed against Union Pacific constitutes non-hearsay under I.R.E. 801(d)(2), as an admission by a party-opponent. For authority, it cites to *McLean v. City of Spirit Lake*, 91 Idaho 779, 783, 430 P.2d 670, 674 (1967), and 17 Am.Jur.2d *Evidence* § 616 (1967). In effect, cross-appellant is saying that a complaint rises to the level of a judicial admission. The authorities cited by appellant do not support this proposition. The district court correctly excluded the Union Pacific complaint to be used as evidence of prior admissions and for impeachment purposes.

VIII.

Did The District Court Err By Excluding Evidence Of The Union Pacific Settlement?

■ Cross-appellant argues that it is appropriate for the jury to be informed of

the ultimate effect of their answers to special verdict questions. For authority, it cites *Luna v. Shockey Sheet Metal & Welding Co.,* 113 Idaho 193, 196, 743 P.2d 61, 64 (1987). The *Luna* case, however, did not deal with submitting settlements between a non-party tort-feasor and the plaintiff to the jury.

Unless a settlement agreement falls into the definition of "Mary Carter Agreements," as defined and explained in *Quick,* 111 Idaho at 778–80, 727 P.2d at 1206–08, and the parties can prove they would be prejudiced by nondisclosure, our rule is that "trial judges have broad discretion in determining the admissibility of such evidence and their decision 'will not be overturned absent a clear showing of abuse.'" *Quick,* 111 Idaho at 780, 727 P.2d at 1208 (quoting *Soria v. Sierra Pac. Airlines, Inc.,* 111 Idaho 594, 606, 726 P.2d 706, 718 (1986)). In this case, the Union Pacific Release is clearly not a "Mary Carter Agreement," and we find that the district court did not abuse its discretion by excluding the agreement.

### IX.

### Did The District Court Err By Excluding Evidence Of Appellant's Mitigation Of Economic Damages?

■ Cross-appellant contends that the district court erred by excluding, as evidence of mitigation of damages, the fact that appellant's business prospered under her management after the death of her husband.

We find no authority that requires a surviving spouse to mitigate damages in this way.

### X.

### Is Respondent Entitled To Attorney Fees, Pursuant To I.C. § 12–121 And I.A.R. 41, For Having To Defend This Appeal?

■ Idaho Code § 12–121 states that "[i]n any civil action, the judge may award reasonable attorney's fees to the prevailing party...." Idaho Appellate Rule 41(a) states that "[a]ny party seeking attorney fees on appeal must assert such a claim as

an issue presented on appeal in the first appellate brief filed by such party...."

Our rule is:

In awarding reasonable attorney fees to the prevailing party on appeal, this Court will be guided by the following general principles. Since the statutory power is discretionary, attorney fees will not be awarded as a matter of right. Nor will attorney fees be awarded where the losing party brought the appeal in good faith and where a genuine issue of law was presented. In normal circumstances, attorney fees will only be awarded when this Court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation.

*Minich v. Gem State Dev., Inc.,* 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979).

Applying this rule to this case, we decline to award attorney fees on appeal to respondent.

### *Conclusion*

For the above reasons, we affirm the decision of the district court.

No costs on appeal.

BISTLINE and JOHNSON, JJ., and REINHARDT, J. Pro Tem., concur.

BAKES, Chief Justice, dissenting.

I disagree with the majority's conclusion in Part V that "[s]ection 8B–9 of the MUTCD is ... manifestly inconsistent with the mandatory stop sign provision of former I.C. § 49–672." *Ante* at 84, 831 P.2d at 551. Our prior cases instruct that whenever possible this Court must construe potentially conflicting provisions in harmony. *Sampson v. Layton,* 86 Idaho 453, 387 P.2d 883 (1963). In this case, I.C. § 49–672 and I.C. § 49–584, which directed the adoption of § 8B–9 of the MUTCD, can indeed be construed consistently.

I.C. § 49–672 specifically provides that stop signs must be placed at all railroad crossings *except* when state or local highway authorities determine that such stop

signs "would constitute a greater hazard than their absence...." However, another statute, I.C. § 49–584 [4] requires the Board to adopt "a manual and specifications for a uniform system of traffic-control devices consistent with ..., and so far as possible, conform[ing] to ... the manual on uniform traffic control devices for streets and highways and other standards issued or endorsed by the federal highway administrator." Based upon I.C. § 49–584, the Board adopted the MUTCD which "conform[s] to the system ... issued or endorsed by the federal highway administrator." The standards set out in the MUTCD were apparently based upon the conclusion that there are more accidents at railroad crossings caused by cars which stop and then stall on the tracks, than there are accidents by cars which do not stop at railroad crossings. Pursuant to I.C. § 49–584, the Board adopted the manual which, in Section 8B–9, reads:

**8B–9 STOP Signs at Grade Crossings (R1–1, W3–1)**

The use of the STOP signs at railroad-highway grade crossings shall be limited to those grade crossings selected after need is established by a detailed traffic engineering study. Such crossings should have the following characteristics:

1. Highway should be secondary in character with low traffic counts.

2. Train traffic should be substantial.

3. Line of sight to an approaching train is restricted by physical features such that approaching traffic is required to reduce speed to 10 miles per hour or less in order to stop safely.

4. At the stop bar, there must be sufficient sight distance down the track to afford ample time for a vehicle to cross the track before the arrival of the train.

The engineering study may determine other compelling reasons for the need to install a STOP sign, however, this should only be an interim measure until active traffic control signals can be installed. STOP signs shall not be used on primary through highways or at grade crossings with active traffic control devices.

Whenever a STOP sign is installed at a grade crossing, a Stop Ahead sign shall be installed in advance of the STOP sign.

Clearly, then, as the result of I.C. § 49–584, § 8B–9 of the MUTCD is not inconsistent with I.C. § 49–672, because it falls directly within its exception, as the legislature no doubt intended.

Ironically, it is the majority's decision today that creates an inconsistency in Idaho law. This Court recently stated in *Bingham v. Idaho Dept. of Transportation*, 117 Idaho 147, 151, 786 P.2d 538, 542 (1990), that "[i]f plaintiffs show at trial that the manual [MUTCD] was not followed by the Department, *Jorstad [v. City of Lewiston*, 93 Idaho 122, 456 P.2d 766 (1969)] suggests that plaintiffs may be entitled to judgment *because the failure of the Department to follow its manual is negligence per se.*" (Emphasis added.) In this case, the Board acted pursuant to legislative directive in I.C. § 49–584 by enacting and following MUTCD requirements, and, pursuant to *Bingham,* it would have been found negligent *per se* for failing to do so. However, today, in direct contradiction to *Bingham,* the majority concludes that the Board is negligent *per se* precisely because it adhered to the legislature's mandate in I.C. § 49–584 by adopting and following MUTCD standards. Regardless of whether the Board follows the directive of this Court in *Bingham* or in this case, two opposite directives, the Board will be guilty

---

4. I.C. § 49–584, recodified as I.C. § 49–201(3), reads:

    **49–201. Duties of board.**—....

    ....

    (3) The board shall adopt a manual and specifications for a uniform system of traffic-control devices consistent with the provisions of this title for use upon highways within the state. The uniform system shall correlate with, and so far as possible, conform to the system set forth in the most recent edition of the manual on uniform traffic control devices for streets and highways and other standards issued or endorsed by the federal highway administrator.

of negligence *per se.* This result is both unfair and inconsistent.

Accordingly, I believe the trial court erred in instructing the jury that the highway district's failure to install a stop sign at the railroad crossing was negligence *per se.* This instruction was clearly contrary to the MUTCD and our *Bingham* case, and was prejudicial error. The case should be remanded for a new trial free of that error.