[No. B036174. Second Dist., Div. Seven. July 18, 1991.]

RAYMOND BARRY, Plaintiff and Appellant, v.
DAVID RASKOV et al., Defendants and Appellants.

448

COUNSEL

Thomasina M. Reed for Plaintiff and Appellant.

Robert S. Gerstein for Defendants and Appellants.

OPINION

**JOHNSON, J.**—Defendants appeal from a jury verdict in favor of plaintiff in his action for fraud, negligent misrepresentation and breach of fiduciary duty. Plaintiff cross-appeals from the nonsuit on his claim for punitive damages under his fraud cause of action. We affirm the judgment except as to prejudgment interest.

### FACTS AND PROCEEDINGS BELOW

Plaintiff, Raymond Barry, is a retired person who, over the course of some 50 years, managed to accumulate $250,000 in a savings account solely from his wages. Mr. Barry had no previous experience with investments, other than his savings account. He had never invested in stocks or bonds or real estate. He did not own a home.

Jefferson Home Loan (Jefferson) is a mortgage loan broker. Jefferson deals exclusively with borrowers who cannot obtain loans from banks or savings and loan institutions due to poor credit ratings, bankruptcies and similar causes. For that reason Jefferson charges high interest rates and looks to the borrower's equity in real estate for protection against default.

The year after he retired, Mr. Barry met a representative of Jefferson at the home of a friend. This representative, Mayers, talked to Mr. Barry about investing in home loans through Jefferson. He told Mr. Barry the loans at Jefferson were very good, were paying high interest and his money would be safe.

The next day Mr. Barry went to the office of Jefferson Home Loan to learn more about investing in home loans. There he met defendant David Raskov, president and sole shareholder of Jefferson. Raskov told Mr. Barry if he invested with Jefferson his investment would be guaranteed "one hundred per cent" and that he would receive a check each month "without fail" and he "would not lose one cent." Barry was also told he would be investing "in an equity home loan" and the equity would protect his investment.

Based on the representations of Raskov and others at Jefferson, Mr. Barry decided to invest in home loans through Jefferson. He began with a $2,000 investment and a few months later invested $3,000 in another loan. He received interest checks on these loans as Jefferson had promised. Mr. Barry then decided to invest $55,000 in a loan to Nancy Fader secured by her residential property. This loan led to the current litigation.

Mayers and Raskov told Mr. Barry the Fader loan was "a very good investment," "it was paying safely" and the owner of the property had "big equity." According to the loan document shown to Mr. Barry the Fader property was appraised at $400,000. There was an existing loan on the property of $100,000 and Fader was seeking a $175,000 loan through Jefferson. The loan was at 23 percent interest. According to the document, the "protective equity" in the property was $125,000. Raskov explained to Mr. Barry that "protective equity" meant Fader's remaining equity in the property after the $175,000 loan. Mr. Barry decided to invest $55,000 in the Fader loan in reliance on the loan document shown him by Raskov and Mayers and their representations concerning the safety of the loan. In particular, Mr. Barry recalled Mayers telling him the property was worth $400,000.

Fader never made any payments on the $175,000 Jefferson loan. When Fader did not make the first payment on the Jefferson loan, Raskov tried to contact her by telephone but was unsuccessful. Around that same time, Raskov received a telephone call from a person who identified himself as an attorney and asked Raskov questions that made Raskov decide to check again on the equity in the Fader property.

Raskov hired Alan Hemenway, an independent appraiser, to make a second appraisal on the Fader property. Hemenway concluded the property was worth $98,000 by comparing it to six other properties that had recently sold in the area. All but one of the comparables sold for under $100,000. One sold for $112,500, but it had a pool and other special features the Fader property did not have. Hemenway also based his appraisal on his opinion the maintenance of the Fader property was substandard. When Raskov received this second appraisal he expressed shock and asked Hemenway if he was sure he had the right address. He then asked Hemenway to take a second look and furnished him with the original appraisal prepared by Wendell Merritt.

Hemenway reported back to Raskov that he had checked the sales of properties Merritt had used as comparable properties in his appraisal and found the first did not exist, the second was a nursery school, and was sold for its value as a business, and the third, which Merritt said was 3,000 square

feet was, in fact, half that size and it had sold for $175,000, not $375,000 as Merritt claimed. In sum, Hemenway told Raskov that the Merritt appraisal was "a fabricated lie." Raskov then ordered a third appraisal by an independent appraiser named Keating. Keating returned an appraisal of $135,000.

The testimony was in conflict as to the status of Wendell Merritt, the original appraiser of the Fader property, whose $400,000 appraisal appeared on the loan document Jefferson showed Barry. Mr. Barry testified Mayers told him Jefferson employed two full-time appraisers, one of whom was Merritt, and that Merritt had been the one who appraised the Fader property. In addition, Mr. Barry testified Merritt had an office at Jefferson and he saw Merritt there.

Raskov testified Merritt was an independent appraiser who worked on individual assignments from Jefferson on a fee basis, generally $75 per appraisal. In 1981, the year Mr. Barry made his investments with Jefferson, Merritt made between 60 and 100 appraisals for Jefferson but he was not an employee of Jefferson and had no desk or office there. Raskov admitted Merritt had made the original $400,000 appraisal on the Fader property and that it was "our appraisal."

Fader defaulted on her first loan as well as the $175,000 Jefferson loan. The property was eventually foreclosed on by the holder of the first trust deed. Mr. Barry lost his $55,000 investment.

Mr. Barry filed suit against Raskov, Jefferson and other defendants. The case went to trial against Raskov and Jefferson on theories of fraud, negligent misrepresentation and breach of fiduciary duty. The trial court disallowed Mr. Barry's claim for punitive damages under the fraud count. The jury returned a unanimous verdict in favor of Mr. Barry awarding him damages in the sum of $55,000 plus 23 percent interest for one year and $25,000 "fiduciary damages." On defendants' motion, the court struck the $25,000 "fiduciary damages." On its own, the court added interest at the legal rate of 10 percent from August 4, 1982, until the judgment is satisfied.

### ISSUES ON APPEAL

1. Did the trial court err in refusing to instruct the jury to determine whether Merritt was an agent of defendants or an independent contractor?

2. Did the trial court err in failing to allow the jury to determine whether to award prejudgment interest?

3. Did the trial court err in failing to allow the jury to determine whether to award punitive damages?

DISCUSSION

I. A MORTGAGE LOAN BROKER IS LIABLE TO THE LENDER FOR THE FRAUD OR NEGLIGENCE OF AN INDEPENDENT PROPERTY APPRAISER IT HIRES TO APPRAISE THE SECURING PROPERTY.

█ Jefferson contends the trial court erred in not instructing the jury to determine whether Merritt, who made the original $400,000 appraisal, was an agent of Jefferson or an independent contractor. A theory of Jefferson's defense was that Merritt was an independent contractor and, therefore, Jefferson was not liable for his negligence or fraud in producing the property appraisal.

█ Once it could be said, as a general rule, one who employs an independent contractor is not liable to third parties for the contractor's torts committed while acting within the scope of the contract. (*Boswell* v. *Laird* (1857) 8 Cal. 469, 490; *Capitol Chevrolet Co.* v. *Lawrence Warehouse Co.* (9th Cir. 1955) 227 F.2d 169, 172; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1009, p. 400; Prosser & Keeton on Torts (5th ed. 1984) p. 509.) Today, however, the exceptions have so overwhelmed the "general rule" it is more accurate to say the employer of an independent contractor will generally be held liable for the contractor's torts and that nonliability is the exception. (*Van Arsdale* v. *Hollinger* (1968) 68 Cal.2d 245, 252 [66 Cal.Rptr. 20, 437 P.2d 508] [original common law rule is applied "'only . . . where no good reason is found for departing from it.'"]; and see 6 Witkin, *supra*, § 1009, pp. 401-402.) The original common law rule is rarely applied outside of motor vehicle accidents. (See *Millsap* v. *Federal Express Co.* (1991) 227 Cal.App.3d 425, 431-432 [277 Cal.Rptr. 807].)

"There are numerous considerations which have led courts to depart from the rule of nonliability of a private employer for the torts of an independent contractor. Some of the principal ones are that the enterprise, notwithstanding the employment of the independent contractor, remains the employer's because he is the party primarily to be benefited by it, that he selects the contractor, is free to insist upon one who is financially responsible, and to demand indemnity from him, that the insurance necessary to distribute the risk is properly a cost of the employer's business and that the performance of the duty of care is of great importance to the public." (*Van Arsdale* v. *Hollinger, supra*, 68 Cal.2d at p. 253.)

These and other considerations are discussed in Sykes, *The Economics of Vicarious Liability* (1984) 93 Yale L.J. 1231 (hereafter *Vicarious Liability*).

The author suggests the decision whether to impose vicarious liability on the employer of an independent contractor should consider the degree to which the contractor's performance is observable by the employer (*id.* at pp. 1236-1238, 1255) and the degree to which the employer can influence the contractor to avoid wrongdoing. (*Id.* at pp. 1254-1255.)

■ These considerations support a rule of vicarious liability for the torts of an independent property appraiser employed by a mortgage loan broker.

The business of mortgage loan brokering primarily benefits the broker, not the appraiser. The broker selects the appraiser and is free to insist on an appraiser who is financially able to indemnify the broker for any wrongdoing. As Sykes points out, if liability is limited to the independent contractor, the employer has an incentive to use potentially insolvent contractors and the availability of bankruptcy protection reduces the independent contractor's incentive to use care in his activities.[1] The insurance necessary to distribute the risk is properly a cost of the broker's business.[2] The performance of the duty of care in making appraisals is of great importance to the public because the borrowers are typically bad credit risks and the equity in the property is the only practical protection the investor has.[3] In addition, the appraiser's conduct is easily monitored by the broker through spot audits. Finally, because the broker has a large number of appraisals to contract out and can choose from a large number of appraisers, the broker can exert considerable leverage over appraisers' workmanship through the incentive of repeat business and the withholding of fees for unacceptable performance. For example, Merritt, who appraised the Fader property, did between 60 and 100 appraisals for Jefferson in the course of a year.

Holding the mortgage loan broker liable for the fraud and negligence of its independent appraiser is consistent with the long line of authority holding

---

[1] "Many agents are potentially insolvent in the face of a substantial judgment against them. Indeed, if an agent's activities create the risk of a judgment that exceeds the agent's net worth and the agent can obtain a discharge in bankruptcy, then the principal and the agent can use the agent's potential insolvency to their advantage under a rule of personal liability. The agent's insolvency increases the expected profits of the principal-agent enterprise by the value of the judgment less the agent's ability to pay, multiplied by the probability of the judgment. A rule of personal liability thus allows the principal and the agent jointly to increase their expected profits by eschewing any risk-sharing agreement or any insurance policy that averts agent insolvency and concurrently provides greater compensation to injured parties." (*Vicarious Liability, supra*, 93 Yale L.J. at pp. 1241-1242.)

[2] For example, in the present case Jefferson received $30,256.24 in commissions and fees for brokering the Fader loan. It paid its appraisers approximately $75 per appraisal.

[3] Barry introduced a newspaper advertisement into evidence in which Jefferson declared it "specialize[s] in loans" to persons "behind in payments; in foreclosure; [with] credit problems; currently unemployed; turn[ed] down by other lenders; [who] can't verify income; [in] bankruptcy."

the employer liable when the employer's enterprise or relationship to the plaintiff is such as to impose on the employer a duty which cannot be delegated to the contractor. (See *Maloney* v. *Rath* (1968) 69 Cal.2d 442, 447 [71 Cal.Rptr. 897, 445 P.2d 513, 40 A.L.R.3d 1] and 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1017, p. 410, citing cases; see also Prosser & Keeton, *supra*, pp. 511-512.)

 The law has long recognized one party may owe a duty to another which, for public policy reasons, cannot be delegated. Such nondelegable duties derive from statutes (*Maloney* v. *Rath, supra*, 69 Cal.2d at p. 448) contracts (*Harold A. Newman Co.* v. *Nero* (1973) 31 Cal.App.3d 490, 496-497 [107 Cal.Rptr. 464]; *Capitol Chevrolet Co., supra*, 227 F.2d at p. 173), and common law precedents. (*Maloney, supra*, 69 Cal.2d at p. 447.) Courts have held a party owing such a duty cannot escape liability for its breach simply by hiring an independent contractor to perform it. (*Maloney* v. *Rath, supra*, 69 Cal.2d at pp. 446-447; 6 Witkin, Summary of Cal. Law, *supra*, Torts, § 1017; Prosser & Keeton, *supra*, at pp. 511-512.)

"[A] nondelegable duty operates, not as a substitute for liability based on negligence, but to assure that when a negligently caused harm occurs, the injured party will be compensated by the person whose activity caused the harm and who may therefore properly be held liable for the negligence of his agent, whether his agent was an employee or an independent contractor. To the extent that recognition of nondelegable duties tends to insure that there will be a financially responsible defendant available to compensate for the negligent harms caused by that defendant's activity, it ameliorates the need for strict liability to secure compensation." (*Maloney* v. *Rath, supra*, 69 Cal.2d at p. 446.)

 A mortgage loan broker owes a fiduciary duty of the "highest good faith toward his principal" and "is 'charged with the duty of fullest disclosure of all material facts concerning the transaction that might affect the principal's decision.' " (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 782 [157 Cal.Rptr. 392, 598 P.2d 45], citations omitted.) The broker owes this duty to the lender-investor as well as to the borrower. (*Montoya* v. *McLeod* (1985) 176 Cal.App.3d 57, 62-63 [221 Cal.Rptr. 353].) This fiduciary duty is nondelegable. The principle is well established a fiduciary cannot delegate fiduciary duties to another in an effort to avoid their strictures or to avoid responsibility for the manner in which they are undertaken. (See *Fund of Funds, Ltd.* v. *Arthur Andersen & Co.* (2d Cir. 1977) 567 F.2d 225, 234.) To hold otherwise would allow mortgage loan brokers to evade their responsibilities by simply allocating them among numerous unlicensed independent contractors. (*Montoya* v. *McLeod, supra*,

176 Cal.App.3d at p. 63; and see *Vicarious Liability, supra,* 93 Yale L.J. at p. 1274.)[4] This would subvert the real estate law's purpose to upgrade the standards of the real estate profession, which includes mortgage loan brokers (Bus. & Prof. Code, § 10131, subd. (d)), and to provide protection to the consuming public. (*Montoya* v. *McLeod, supra,* 176 Cal.App.3d at p. 63.)

In addition to the general fiduciary duty imposed on mortgage loan brokers, the Business and Professions Code imposes on the broker the duty to provide a prospective lender with a statement including, inter alia, the "[e]stimated fair market value of the securing property." (Bus. & Prof. Code, § 10232.5, subd. (a)(2).) The statute goes on to provide, "[I]f the broker is relying on an appraisal in estimating the fair market value," the statement must contain "the date that the appraisal was made and the name and employment of the person who made the appraisal." (*Ibid.*)[5]

It is clear from this statute the duty to provide an estimate of the fair market value of the property rests exclusively with the broker. Although the broker may use an appraisal by an independent appraiser in determining the estimated value of the property, nothing in the statute suggests the broker may delegate its statutory duty to the appraiser. Moreover, the purpose of the statute points to a nondelegable duty. The statutory provisions regulating a mortgage loan broker's disclosure of information to a prospective lender-investor constitute a legislative recognition of the fact negligent or fraudulent property valuations pose a serious risk to the public. (See *Edmonds* v. *Augustyn* (1987) 193 Cal.App.3d 1056, 1059-1060 [238 Cal.Rptr. 704].) The responsibility for minimizing that risk or compensating for the failure to do so properly rests with the person licensed by the state to engage in the enterprise that creates the risk, the mortgage loan broker. The broker is not required to obtain an appraisal from an independent appraiser. If the broker does so, it does so for its benefit. The broker selects the appraiser and is free to demand risk protection from the appraiser it selects. The cost of the broker's liability insurance is properly attributable to the risk. The duty to exercise reasonable care in stating the fair market value of the property is of great importance to the public. (Cf. *Maloney* v. *Rath, supra,* 69 Cal.2d at p. 448.)

---

[4]The author notes allowing a party to escape liability for implicit contractual obligations by delegating performance to independent contractors "would often create an enormous incentive for a contracting party to avoid the risk of a breach of contract by delegating [its] obligations to an insolvent contractor." (*Ibid.*)

[5]See also Business and Professions Code section 10237.6 which provides: "An appraisal of each parcel of real property which relates to a transaction subject to this article shall be made by the real property securities dealer or by an independent appraiser unless the purchaser of the obligation to which the parcel relates states in writing to the broker that he will obtain his or her own appraisal. An appraisal by the dealer or his or her agent made pursuant to this section shall be kept on file for four years and a copy of the appraisal shall be delivered to the purchaser prior to the time the purchaser becomes obligated."

We conclude, therefore, a mortgage loan broker is liable to the lender for the fraud or negligence of an independent property appraiser hired to appraise property that will be used to secure the loan. From this conclusion it necessarily follows the trial court did not err in failing to instruct the jury to determine whether Merritt was an employee or agent of Jefferson or an independent contractor. Such a determination was irrelevant to Jefferson's liability to Barry.

## II. The Trial Court Erred in Granting Prejudgment Interest on Its Own Motion.

The jury awarded Mr. Barry damages in the sum of $55,000 plus 23 percent for one year. The trial court, on its own motion, added interest on the sums awarded by the jury to run from August 4, 1982, until the judgment is satisfied. This was error.

The award of prejudgment interest was a matter committed by statute to the discretion of the jury. Civil Code section 3288 provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." The trial court had no authority to usurp the discretion conferred on the jury. (See *Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 814, & fn. 17 [148 Cal.Rptr. 22, 582 P.2d 109, 7 A.L.R.4th 642]; *Nathanson v. Murphy* (1957) 147 Cal.App.2d 462, 466-467 [305 P.2d 710].)

## III. The Trial Court Correctly Refused to Instruct the Jury on Punitive Damages.

At the time this case was tried, May 1988, Civil Code section 3294 provided, in relevant part, "(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant. [¶] (b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation." . . . [¶] "(c)(3) 'Fraud' means an intentional misrepresentation, deceit, or concealment of a material

fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

██ The trial court specifically relied on these sections in granting a nonsuit on Mr. Barry's claim for punitive damages.

While the trial court must instruct the jury on every theory of the case supported by substantial evidence (*People* v. *Edwards* (1985) 39 Cal.3d 107, 116 [216 Cal.Rptr. 397, 702 P.2d 555]) and may not weigh the credibility of witnesses (*People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1]), the court is under no obligation to instruct if the evidence is minimal and unsubstantial. (*People* v. *Kaurish* (1990) 52 Cal.3d 648, 696 [276 Cal.Rptr. 788, 802 P.2d 278].) The trial court found, correctly, the evidence was not "clear and convincing" there was fraud on the part of Merritt or any other employee of Jefferson or on the part of Raskov. Furthermore, the evidence would not support a finding Jefferson knew Merritt was unfit as a property appraiser or ratified his conduct.

## DISPOSITION

The judgment is reversed insofar as it awards interest between August 4, 1982, and June 3, 1988. In all other respects the judgment is affirmed. Respondent is awarded costs on appeal.

**WOODS (Fred), J.,** Concurring.—I concur in the judgment, but write separately to express dissatisfaction with the reasoning contained in the lead opinion under subparagraph I of the DISCUSSION pertaining to third party liability of the broker for the tortious acts of an independent property appraiser.

I am of the opinion that there was sufficient evidence (slight) before the trier of fact to entitle appellant to the requested jury instruction on whether the appraiser was an agent of the broker or an independent contractor. The court erred in failing to give the requested instruction. I am convinced, however, from the facts demonstrated in this record that no different result would have been obtained had the requested jury instruction been given and accordingly find no reason to reverse or remand for new trial. (*Jacobs* v. *Bozzani Motors, Ltd.* (1952) 109 Cal.App.2d 681, 686-687 [241 P.2d 642]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal § 350.) The evidence of *lack* of independence on the part of the appraiser is overwhelming in this instance.

The seat of my dissatisfaction with the lead opinion on this issue is the expansiveness of the reasoning, which in my opinion, far exceeds the narrow

question of whether the court erred in failing to give the requested instruction concentrating on the existence or nonexistence of an independent contractor status. The tenor of the lead opinion on this narrow issue is evangelistic in style and ventures into the world of dicta with an exceedingly broad brush. More importantly, the lead opinion fails to effectively focus on the paramount question in this case, namely, the issue of "independence." "Independence" is the key ingredient to determining whether or not the appraisal contractor in this case is indeed an "independent" contractor. In my view, the lead opinion misses the target by concentrating inordinately on hypothetical factual analogies far removed from the case at bar to the emaciation of a discussion on the central question of "independence."

The lead opinion would propel us toward a legal conclusion inadvisably close to one of absolute liability and insurance by the principal for the tortious acts of "independent" contractors devoid of due regard for the key element of "independence." I do not perceive such a proposition to be the law nor indeed desirable.

Other than as stated, I concur in the judgment of the lead opinion.

Lillie, P. J., concurred.