[No. E021913. Fourth Dist., Div. Two. June 10, 1999.]

AETNA HEALTH PLANS OF CALIFORNIA, INC., Cross-complainant and Appellant, v.
YUCAIPA-CALIMESA JOINT UNIFIED SCHOOL DISTRICT, Cross-defendant and Respondent.

COUNSEL

Galton & Helm, Hugh H. Helm, Michael B. Bernacchi; Gibson, Dunn & Crutcher and John J. Swenson for Cross-complainant and Appellant.

Borton, Petrini & Conron and Daniel L. Ferguson for Cross-defendant and Respondent.

OPINION

**WARD, J.**—Cross-complainant and appellant Aetna Health Plans of California, Inc. (Aetna), appeals after the trial court granted summary judgment in favor of cross-defendant and respondent Yucaipa-Calimesa Joint Unified School District (Yucaipa), and dismissed Aetna's cross-complaint against Yucaipa.

The case presents the question whether indemnity or contribution may be had between two insurers that each potentially provided coverage for the same incident, and in particular whether one insurer may allege a cause of action for contribution or indemnity from the other insurer when both insurers' conduct may have contributed to a single tort injury.

The trial court granted summary judgment on the theory that, as a matter of law, no cause of action could be maintained for contribution or indemnity as between the two insurers, because their liability for damages is several under Proposition 51.[1] Because the liability of each insurer has been made several, and therefore divisible, by statute, and the plaintiff's recovery against each insurer for noneconomic damages is limited only to the amount

---

[1] The Fair Responsibility Act of 1986 (Civ. Code, §§ 1431-1431.5) is popularly known as Proposition 51.

proportional to the insurer's fault, we conclude that Aetna's cross-complaint could not properly state any cause of action for contribution or equitable indemnity. Accordingly, we affirm.

## FACTS AND PROCEDURAL HISTORY

Aetna was the primary insurer, and Yucaipa was the secondary insurer, of medical benefits for plaintiff's decedent, David Goodrich. David was employed by the County of San Bernardino. Through Aetna, one of the insurance carriers that provided health care plans for county employees, David selected a health maintenance organization (HMO) as his medical provider. Aetna's HMO plan provided that any member, such as David, would be treated in a physician group, with one member of the group as his primary care physician. Any other care would have to be arranged by special referral.[2]

David's spouse, Teresa, the plaintiff in the underlying action below, was employed by Yucaipa. Yucaipa provided self-insured medical coverage to Teresa. As Teresa's spouse, David was also eligible to be covered by Yucaipa's medical coverage.

---

[2]The plan booklet recited numerous general terms of the coverage, including the statement that:

"Your Primary Care Physician is your personal physician, directing and arranging your health care services and determining if you should be referred to another physician for special treatment. Only after thoroughly evaluating your physical condition and medical history will he or she refer you to another physician."

Another provision stated: **"Only when the IPA/Medical Group determines that it cannot provide the specialty care will you be referred outside the [group]."** (Boldface in original.)

Referral procedures were outlined as follows:

"If you are referred to another doctor for consultation or treatment, please note the following:

" . . . . . . . . . . . . . . . . . . . . . . . . . .

"Referrals are valid only for the services specified. For example, if your referral states 'Consultation Only' and you receive consultation and treatment, you may have to pay for the treatment. . . .

"You must be referred to a participating provider unless your physician has received special authorization from Aetna Health Plans to refer you elsewhere prior to services being rendered.

" . . . . . . . . . . . . . . . . . . . . . . . . . .

"For some types of referrals, your Primary Care Physician must contact Aetna Health Plans in advance for authorization.

"These guidelines apply to all members. If these guidelines are not followed, charges for medical services may become your financial responsibility."

Elsewhere in the booklet, the plan iterated that, "To assure coverage for the following services, your Primary Physician must contact Aetna . . . in advance for authorization by the Plan:

"1) For referral to a non-participating physician or other provider."

On June 9, 1992, David collapsed and was taken to a hospital. After he was stabilized, David obtained a referral on June 23, 1992, from his primary care physician for exploratory surgery with another plan specialist. The specialist performed diagnostic surgery on July 6, 1992. David was diagnosed with a rare form of stomach cancer, leimosarcoma. On July 28, 1992, the specialist told David and Teresa that the plan doctors did not have the expertise to treat this rare form of cancer, and David should be referred to the City of Hope, an out-of-plan provider. Aetna approved the referral to City of Hope on August 5, 1992.

The City of Hope doctor evaluated David and recommended high-dose chemotherapy and a bone marrow transplant. David was scheduled to begin treatment on October 2, 1992. When David went to the City of Hope on October 2, however, tests revealed that the cancer had metastasized to his liver. On October 6, therefore, the City of Hope doctor recommended modifying the treatment plan to begin with standard-dose chemotherapy to see if the tumors on David's liver would respond. David was scheduled to begin the treatment at City of Hope on October 10, 1992.

As a result of the change in David's condition, his primary care physician asked for referral authorizations for a consultation on chemotherapy at City of Hope, and for the plan's oncologist to determine whether the standard-dose chemotherapy should be done by in-plan doctors. On October 23, 1992, Aetna denied authorization for CT scans, lab work and initial chemotherapy at City of Hope, because the in-plan oncologist could provide this treatment. On November 18, 1992, Aetna also denied approval of the bone marrow transplant, on the ground that the treatment was experimental in its application to already metastasized leimosarcoma.

David's disease stabilized under standard-dose chemotherapy over the next several months. In February of 1993, David and Teresa heard about a cryosurgical procedure that might benefit him, which was available at St. John's Hospital (St. John's), an out-of-plan provider. After spending time researching the procedure, David asked for a referral. David's primary care physician referred David to an in-plan oncologist for a consultation on August 5, 1993. Three weeks later, the oncologist recommended that David go to St. John's for consultation. That same day, August 26, 1993, David's primary care physician asked Aetna for approval of the referral to St. John's. Because he wanted treatment without delay, David scheduled an appointment for September 3, 1993, at St. John's, without having obtained prior approval from Aetna. David had cryosurgery on September 22, 1993. Aetna initially denied coverage for the cryosurgery, in November of 1993, on the

ground that David had not gotten prior authorization for use of an out-of-plan facility. Ultimately, Aetna did pay most of the bills for this cryosurgery, though it denied payment for follow-up treatment, e.g., follow-up CT scans.

After the cryosurgery in September of 1993, David returned to work. In October of 1994, he began to experience further difficulties, and in December of 1994, he had to stop working. By January of 1995, David's abdomen became distended, his legs became swollen, and he was unable to eat. David went to St. John's to discuss the possibility of another cryosurgery. On January 11, 1995, David asked his plan primary care physician for a referral for the cryosurgery.

On January 17, 1995, David went to St. John's. He had not received prior approval for the admission from Aetna. Yucaipa had, however, preapproved the procedure.[3]

David underwent surgery, but the cryosurgery could not be completed because David's tumor was too large. On January 18, 1995, Aetna sent a letter denying coverage because: (1) David had gone to St. John's on self-referral; (2) there was no prior authorization for the hospital admission; and (3) St. John's was a nonparticipating facility.

David remained hospitalized at St. John's in the critical care unit from the date of surgery, January 17, 1995, until his death on March 15, 1995. Teresa was left with approximately $500,000 in outstanding unpaid medical bills, largely from St. John's for the January 17, 1995, surgery and follow-up care. Neither Aetna, which had denied approval for the procedures and care, nor Yucaipa, which had granted approval, paid the outstanding bills, until about May of 1996, when Yucaipa paid bills totaling approximately $500,000.

Teresa filed an action against Aetna and the HMO medical group in March of 1996. The operative complaint is the fourth amended complaint. She alleged causes of action against Aetna, in her capacity as David's successor in interest, for breach of the covenant of good faith and fair dealing, and for breach of contract. Teresa also alleged causes of action against Aetna on her own behalf, for negligent infliction of emotional distress, for intentional infliction of emotional distress, and for wrongful death.

The fourth amended complaint alleged that Aetna had caused emotional distress by denying approval for medical treatment when Aetna knew or

---

[3]Yucaipa also apparently issued authorizations to St. John's for David's continued hospitalization.

should have known the treatment was necessary and should have been covered, by delaying and denying authorizations for treatment, even though Aetna knew or should have known that David's need was urgent and the care, if not covered, was very expensive, and by forcing Teresa to witness David's death, caused by the delays and denials of approval.

In form and special interrogatories, Aetna asked Teresa to state all the facts upon which she based her claims of negligent and intentional infliction of emotional distress, and all the emotional injuries she suffered. Teresa averred that she suffered "emotional distress relating to the last days spent with David that were filled with anguish and worry; distress over enormous outstanding medical bills; inability to stop pondering every day that David would still be alive if only AETNA would have authorized, without delay, all medical treatment sought by David's treating specialists."[4] Components of Teresa's emotional distress thus included claims (1) that Aetna's alleged failure to approve or timely approve treatment caused worry whether David and Teresa would have any future together, (2) that Aetna's alleged failure to approve or timely approve treatment ultimately hastened David's death, causing Teresa grief, sadness and depression, and (3) that Aetna's failure to approve and pay for David's treatment caused Teresa to worry about the medical bills.

Teresa did not sue Yucaipa. Aetna sought to cross-complain against Yucaipa on theories of equitable indemnity, partial equitable indemnity, contribution, and similar theories, alleging that Yucaipa was also at least partially at fault on the emotional distress causes of action. Although David

---

[4]Teresa's answers to form interrogatories specified that she suffered "Severe mental and emotional distress and frustration with [Aetna's] . . . referral, pre-authorization and approval process . . . ; severe mental and emotional distress relating to medical bills left owing by Teresa upon the death of David; profound grief over the untimely and premature loss of David Goodrich as a result of the wrongful denial of benefits and delay in authorization of benefits . . . ; extreme mental and emotional distress relating to the last days of David's life [because] . . . David was consumed with concern over the medical bills Teresa would be left facing upon David's death. . . ."

In answers to special interrogatories, Teresa stated she had suffered physical distress from "many sleepless nights worrying whether David would be allowed access to life-saving treatment" on account of Aetna's delays and denials of approval for treatment while David was alive, and "many more sleepless nights worrying about how she was going to pay the enormous medical bills" after David's death. Teresa stated she had experienced nervousness, headaches and loss of appetite. She suffered mental and emotional distress consisting of anger and frustration over the referral, and pre-approval process Aetna employed; "concern and humiliation" over the medical bills owing on David's death; "profound grief, sadness, and depression over [David's] untimely and premature death" caused by the delay or denial of benefits; and distress because David and Teresa could not spend their last time together without being "consumed with concern over the medical bills Teresa would be left facing," on account of Aetna's failure to pay.

went to St. John's for his final surgery without authorization from Aetna, St. John's had asked Yucaipa, as the secondary insurer, for certification of payment. Yucaipa had granted the certification, and accepted liability for the payment before St. John's treated David. Besides the cost of the surgery, David also incurred very expensive costs for continued treatment, as he remained at St. John's in the critical care unit for nearly another two months after surgery. St. John's had asked for and apparently received continuing certifications from Yucaipa for payment of these services. Yucaipa, unlike Aetna, had not disputed but had already accepted liability for paying the medical bills as secondary insurer; therefore, any emotional distress Teresa suffered on account of the nonpayment of the bills was attributable at least in part to Yucaipa's conduct. Aetna asserted that it was not the sole tortfeasor responsible for Teresa's emotional distress. Under Teresa's fourth amended complaint, Aetna asserted that it could be held liable for damages caused at least in part by Yucaipa's, rather than Aetna's, conduct. This was the basis for its claim of indemnity, partial indemnity, or contribution.

Yucaipa moved for summary judgment on Aetna's cross-complaint, arguing that Teresa's fourth amended complaint alleged damages only against Aetna, and that any damage recovery for plaintiff against Aetna could only be based on Aetna's several conduct and liability; therefore, nothing that plaintiff could be awarded against Aetna could be attributable to the several conduct of Yucaipa, and there was thus no basis for contribution or indemnity. Yucaipa urged that, as a matter of law, Aetna could make no claim for indemnity or contribution against Yucaipa.

Aetna opposed the motion for summary judgment. Aetna agreed with all Yucaipa's statements of undisputed material fact,[5] except that Aetna disputed the assertion that "Plaintiff has not alleged any liability on the part of

---

[5] Yucaipa's motion for summary judgment listed the following undisputed facts:

1. Aetna was the primary health insurer and Yucaipa was the secondary insurer for David.

2. Teresa's complaint alleged a cause of action against Aetna for bad faith by denying and/or delaying treatment, approvals, or payments.

3. Teresa's complaint alleged consequential damages, i.e., damages flowing from Aetna's alleged bad faith.

4. Aetna's cross-complaint alleged that Yucaipa had improperly denied or delayed payment to Teresa. It also alleged that Yucaipa had asserted a lien against any recovery Teresa might be awarded against Aetna.

5. Aetna's cross-complaint alleges Yucaipa was liable to pay claims that Aetna had denied.

6. Aetna's cross-complaint alleges that Yucaipa denied or delayed payment, such that Yucaipa is liable for extracontractual damages, such as emotional distress.

7. Aetna's cross-complaint alleges that Yucaipa is liable for extracontractual, emotional distress damages in asserting a lien against Teresa's recovery from Aetna.

8. Teresa did not name Yucaipa as a defendant in her complaint.

9. Teresa's complaint did not allege improper claims handling by Yucaipa.

Aetna that is based upon any conduct, act or omission on the part of Yucaipa." Aetna responded that "The emotional distress and extra contractual damages claimed by Plaintiff are properly attributable to conduct, acts or omissions of Yucaipa."

To demonstrate its contention, Aetna relied, among other things, on matters that had come to light through discovery. Various letters showed that Yucaipa had asked St. John's to delay in collecting payment on the outstanding medical bills until St. John's had resubmitted the matter to Aetna. In March of 1996, a year after David's death, St. John's notified Yucaipa that it had received Aetna's final denial; St. John's then asked for "full and final" payment based on Yucaipa's previous authorizations and certifications, which it had "given as prime carrier."

In the meantime, Teresa's counsel had attempted to work out an agreement with Yucaipa, that Yucaipa would pay Teresa's counsel directly, and Teresa would then be responsible to pay St. John's. Teresa would agree to sue Aetna and to release Yucaipa. The negotiations were carried on between December of 1995 and March of 1996. St. John's and the other unpaid medical providers were reluctant to have Yucaipa pay the promised benefits to Teresa, however; accordingly, the proposed agreement was not executed. Yucaipa, by a letter dated March 19, 1996, informed Teresa that it "ha[d] no choice" but to pay the providers directly. Teresa's attorney wrote to Yucaipa, stating that the complaint was ready to be filed against the other defendants—Yucaipa was not to be named as a defendant—and the complaint as drafted alleged that Yucaipa had paid the outstanding medical bills. Counsel held filing of the complaint "until such time as that statement is true." Throughout the negotiation period, Yucaipa had stood "ready, willing

10. Teresa's complaint did not allege "any liability on the part of Aetna that is based upon any conduct, act or omission on the part of Yucaipa."

11. Aetna's cross-complaint does not allege that Aetna paid benefits for which Yucaipa should bear responsibility.

12. Yucaipa cross-complained against Aetna, alleging that it had paid benefits for which Aetna should have been responsible.

These recitals essentially assert as "facts" the existence of certain allegations in each of the relevant pleadings. Naturally, the "fact" that a pleading has made an allegation is patent on the face of the pleading; generally, it is difficult to "dispute" that such an allegation has been made. The only disputed assertion here was number 10, that Teresa's complaint did not allege any damages which had any relation to any act or omission of Yucaipa. This asserted "fact" encompasses a legal conclusion, and one that is false in logic. Although it is true that Teresa's complaint alleges only acts by Aetna, and alleges damages for emotional distress on account of Aetna's conduct, it does not follow from the mere "fact" of the allegation that the damages Teresa alleged were solely caused by Aetna's conduct. Nothing in Teresa's allegation negates the possibility that the damages were occasioned, in whole or in part, by another tortfeasor's act or omission.

and able to provide benefits to [Teresa] under the terms and conditions of the health plan," but had nevertheless delayed payment. Yucaipa also offered "to assist [Teresa] . . . in any way that it can to help prosecute [the] lawsuit [against Aetna]."

Ultimately, Teresa's counsel filed suit in March of 1996, "without naming the Yucaipa School District based upon the representations you [i.e., Yucaipa] have made relative to [making payments to the medical providers] . . . ." Yucaipa apparently finally made payment on or about May 30, 1996; it sent a letter to St. John's acknowledging that the fiscal year for St. John's was to close on May 31, 1996, and St. John's needed final payment before then.

Based on these matters, Aetna argued that, insofar as Teresa alleged emotional distress injury from worry over the outstanding unpaid medical bills, Yucaipa's conduct had also contributed to that injury. The allegations of the complaint did not attribute any aspect of the emotional distress damages to Yucaipa, however.

Yucaipa reiterated its argument that the emotional distress claim arose out of the breach of contract and breach of the implied covenant claims; Aetna was solely responsible for its breach of its own contract and/or covenant, and therefore nothing Teresa alleged was conduct for which Yucaipa could be liable. Yucaipa and Aetna could each be liable only for breach of its own respective contract, and the extent of that liability would be determined by their respective contracts.

Yucaipa claimed that Aetna had failed to dispute with any competent evidence that Teresa had not alleged any damages except those attributable to Aetna. Yucaipa asserted, "If Aetna believes it can prove at trial that it properly denied plaintiff's claims, then the jury will find it did not breach its contract let alone commit tortious breach of contract. [¶] If it is Aetna's position that even though it wrongfully denied plaintiff's claims, Yucaipa was duty bound to step down and promptly pay the claims . . . , Aetna is certainly free to make that argument to the jury and does not need a cross-complaint to do so. However, it will be a spurious argument because if Aetna wrongfully denied plaintiff's claims, it should be legally responsible for all extra-contractual damages resulting therefrom and Yucaipa would be legally entitled to reimbursement of the $500,000 it was forced to pay because of Aetna's bad faith breach of contract."

The trial court noted that Teresa's complaint was "directed at Aetna and [did] not contemplate" Yucaipa as a defendant. The court was persuaded that

all the conduct for which Aetna sought indemnity was based on Aetna's breach of its own contract. There was no contractual relationship between Aetna and Yucaipa. The court ruled that the emotional distress causes of action "ha[d] as its genesis all of the allegations which are directed at Aetna and don't contemplate Yucaipa, and for which Aetna has liability, if any, only on a several basis because they contemplate noneconomic damages." The court found that "all of plaintiff's allegations that Aetna failed to pay the bills is the bad faith element of the breach of contract, and Yucaipa is not a party to that contract. Therefore, Yucaipa is not amenable to suit under that contract." The court concluded that, as a matter of law, Aetna could not maintain any cause of action against Yucaipa for indemnity or contribution, and granted the motion for summary judgment. Accordingly, the court entered judgment in favor of Yucaipa and against Aetna on Aetna's cross-complaint.

Aetna now appeals.

## ANALYSIS

### I. *Standard of Review*

The standard of review after an order granting summary judgment is well established. The motion for summary judgment is properly granted " 'if all of the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether the papers show that there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, . . . and all inferences reasonably deducible from the evidence . . . .' (Code Civ. Proc., § 437c, subd. (c).)" (*Parsons* v. *Crown Disposal Co.* (1997) 15 Cal.4th 456, 464 [63 Cal.Rptr.2d 291, 936 P.2d 70].)

"This court exercises its independent judgment as to the legal effect of the undisputed facts disclosed by the parties' papers. [Citations.] In so doing, we apply the same three-step analysis required of the trial court: We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]" (*Torres* v. *Reardon* (1992) 3 Cal.App.4th 831, 836 [5 Cal.Rptr.2d 52].)

Here, the parties largely do not dispute any facts; rather, Yucaipa's motion for summary judgment presented the argument that, as a matter of

law based on the pleadings, Aetna could not state a cause of action for any kind of contribution or indemnity. We review issues of law de novo. (*California Country Club Homes Assn.* v. *City of Los Angeles* (1993) 18 Cal.App.4th 1425, 1438 [22 Cal.Rptr.2d 917]; see also *People* v. *Figueroa* (1999) 68 Cal.App.4th 1409, 1413 [81 Cal.Rptr.2d 216].)

## II.   *Step One—The Issues Tendered by the Pleadings*

Aetna's cross-complaint attempted to allege causes of action for total equitable indemnity, comparative indemnity, implied indemnity, contribution and declaratory relief. The causes of action are not theoretically distinct, but all depend upon the allegations that (1) Teresa is suing Aetna for delay in referrals and authorizations for care and failure to pay for medical expenses incurred; (2) Aetna was not liable under its contract to provide the disputed benefits, but even if Aetna was liable as a primary insurer for medical benefits, Yucaipa was also liable as secondary insurer to pay for the same benefits; and (3) Yucaipa was therefore liable for some or all of the extracontractual, or noneconomic, damages claimed by Teresa, especially all the emotional distress damages.

Notably, Aetna's cross-complaint does not attempt to allege Yucaipa should be liable to reimburse Aetna for any damages Aetna should have paid under Aetna's contract. Manifestly, although Aetna had approved some of the treatments and paid some of the bills, the disputed amounts consist of amounts Aetna did not pay. As to contractual damages, the liability of either Aetna or Yucaipa to provide benefits depends upon the provisions of each respective contract; the contracts also provide for coordination of benefits between the two insurers.

Aetna's cross-complaint seeks contribution or indemnity solely on account of noneconomic damages claimed by Teresa.

## III.   *Step Two—Yucaipa's Motion Justified Judgment in Its Favor as a Matter of Law*

Having established that Aetna's pleading treats solely with contribution or indemnity for noneconomic damages, we next look to the showing made in Yucaipa's motion for summary judgment.

### A.   *The "Factual" Allegation That Teresa's Complaint Seeks Damages Against Aetna Solely for Aetna's Conduct Is Incorrect*

As we previously noted, virtually all the "facts" asserted in Yucaipa's motion papers are largely incontrovertible recitals of what the various

pleadings have alleged. The "fact" that an allegation has been made is perhaps a fact; the legal meaning of the allegation made presents a question of law.

Some of Yucaipa's assertions, though incontrovertible, are irrelevant. It is irrelevant, for example, that Teresa has not chosen to sue Yucaipa.

The disputed assertion that Teresa's complaint does not allege any damages which could be based on any conduct of Yucaipa is not a simple repetition of the allegation; it attempts to characterize the legal effect of what has been pled. This presents a question of law. In this one instance, Yucaipa's characterization of what was pled is in error. Clearly, the allegations of Teresa's fourth amended complaint claim emotional distress damages because of enormous unpaid medical bills. Although Teresa has only sued Aetna and she only seeks to hold Aetna responsible for those damages, her complaint has simply left out potentially provable evidence that, for example, Yucaipa had already accepted liability to pay the disputed bills before they were incurred. If Yucaipa did not timely pay after its promise to do so, or if Teresa acquiesced in the delay, these would be possible "facts" which would indicate that persons other than Aetna were legally responsible for some or all of the damages Teresa alleged she suffered. Thus, it is logically incorrect to state that Teresa's complaint does not allege any damages which could be attributed to the conduct of Yucaipa. The allegations of the fourth amended complaint do not negate the possibility that some of the damages alleged may in fact be attributable to conduct of Yucaipa, or of some other actor.

B.  *Aetna Can Only Be Held Responsible for the Portion of Noneconomic Damages Proportional to Its Fault*

Nonetheless, even if Yucaipa is wrong and Aetna is right in asserting that the legal claim made in the fourth amended complaint is broad enough to hold Aetna liable for damages which could properly be assignable to the conduct of others, Yucaipa's moving papers still show that it is entitled to judgment in its favor. This is because Proposition 51 makes Aetna liable to pay only for the portion of noneconomic damages proportionate to its percentage of fault.

1.  *Background of Multiple Tortfeasor Liability*

Before 1975, proportional fault was not generally considered in tort cases. If the plaintiff were even slightly at fault, the doctrine of contributory negligence completely barred any recovery, even if others were also at fault, and even if others bore a greater degree of fault than the plaintiff. On the

other hand, as between multiple tortfeasors, the concept of joint and several liability meant that any concurrent tortfeasor could be held liable for the whole of the plaintiff's damages, even if other tortfeasors were more at fault. Moreover, at that time, the plaintiff could pick and choose among the available defendants to single out those most able to pay, and the target defendant had little recourse against the other defendants for contribution or indemnity. (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1196-1197 [246 Cal.Rptr. 629, 753 P.2d 585].)

In *Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393], the California Supreme Court did away with the complete bar of contributory negligence and implemented a concept of comparative fault. The plaintiff's recovery against one or more tortfeasors could thereafter be reduced only by the plaintiff's comparative share of fault.

In *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], the California Supreme Court refined application of *Li*: although joint and several liability among multiple tortfeasors was retained, the plaintiff could no longer unilaterally select which defendant or defendants would be sued. The target defendant or defendants could join other defendants by means of cross-complaint, and ". . . any defendant could obtain equitable indemnity, on a comparative fault basis, from other defendants, thus permitting a fair apportionment of damages among tortfeasors. (See [*American Motorcycle Assn.* v. *Superior Court*, *supra*,] 20 Cal.3d [578,] 591-598.)" (*Evangelatos* v. *Superior Court*, *supra*, 44 Cal.3d 1188, 1197.)

"In sum, by 1986 the courts had eliminated certain inequities of the former tort recovery system, but so-called 'deep pocket' defendants whose fault was slight could still be saddled with large damage awards mainly attributable to the greater fault of others who were able to escape their full proportionate contribution. (See *Evangelatos*, *supra*, 44 Cal.3d at p. 1198.) Proposition 51 sought to modify this system of recovery." (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 599 [7 Cal.Rptr.2d 238, 828 P.2d 140].)

The purpose of Proposition 51 is to hold tort defendants "financially liable in closer proportion to their degree of fault." (Civ. Code, § 1431.1, subd. (c).) To achieve this purpose, Proposition 51 amended Civil Code section 1431 to state that "[a]n obligation imposed upon several persons . . . is presumed to be joint, and not several, except as provided in Section 1431.2 . . . ." Civil Code section 1431.2, in turn, provides that, in comparative fault actions, "the liability of each defendant for non-economic damages

shall be several only and shall not be joint," and that "[e]ach defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." (*Id.*, subd. (a).)

"Economic damages" means "objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities." (Civ. Code, § 1431.2, subd. (b)(1).) "[N]on-economic damages" means "subjective, non-monetary losses including . . . pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).)

As to strictly provable medical costs and other tangible amounts, multiple tortfeasors still bear joint and several liability after Proposition 51. But as to intangible amounts, such as pain, suffering, or emotional distress, Proposition 51 has made multiple tortfeasors each liable solely in proportion to its assessed degree of fault. Proposition 51 thus allows an injured plaintiff to recover the full amount of economic damages suffered, regardless of which tortfeasor or tortfeasors are named as defendants. The tortfeasors are left to sort out payment in proportion to fault amongst themselves, and they must bear the risk of nonrecovery from impecunious tortfeasors. As to noneconomic damages, however, the plaintiff must sue all the tortfeasors to enable a full recovery. Failure to name a defendant will preclude recovery of that defendant's proportional share of damages, and the plaintiff will bear the risk of nonrecovery from an impecunious tortfeasor.

### 2. Teresa's Recovery from Aetna in the Underlying Action Must Be Limited to Aetna's Proportional Share of Fault

#### a. Aetna Has No Claim Against Yucaipa for Economic Damages

Insofar as Teresa has alleged that Aetna breached its contract to provide or pay for medical benefits and expenses, these are economic damages governed by the terms of the contract. As between the two insurers, each of whose contract arguably provided coverage for the economic expenses, the liability of each is governed by contract-based rules. Aetna has admitted that, under both its own and Yucaipa's contracts, Aetna was the primary insurer and Yucaipa the secondary insurer of David's medical benefits. Thus, the coordination of benefits provisions of the two contracts may expressly provide for an appropriate division of the medical expenses.

██ Otherwise, overlapping insurance coverage is governed by contract-based equitable sharing principles: "A claim such as the instant one for contribution among insurers providing overlapping coverage for the same insured rests on equitable principles. [Citation.] However, in cases involving multiple policies covering the same loss, the courts have allocated the burden of paying among several insurers without reference to questions of the comparative fault or negligence of such insurers, because their obligation to protect the insured arises from a contract, *not* because the insurers were negligent or at fault. (See, e.g., *Continental Cas. Co.* v. *Zurich Ins. Co.* (1961) 57 Cal.2d 27, 34-38 [17 Cal.Rptr. 12, 366 P.2d 455] [defending insurer is entitled to compel contribution from nonparticipating insurers; amount of contribution is determined by examining contractual language to adjust responsibility in an equitable manner].) Thus, in cases involving duplicate or overlapping insurers, the courts have prorated the responsibility by focusing on contractual issues rather than on 'fault' concepts [citation], and have ordered proration based on the proportion each insurer's coverage bore to the total coverage provided by all policies (see, e.g., *Government Employees Ins. Co.* v. *St. Paul Fire etc. Ins. Co.* (1966) 243 Cal.App.2d 186, 191-192 [52 Cal.Rptr. 317] [St. Paul policy had $100,000 limits; GEICO policy had $20,000 limits—GEICO required to share one-sixth of costs, based on $20,000/$120,000 ratio])." (*Hartford Accident & Indemnity Co.* v. *Superior Court* (1994) 29 Cal.App.4th 435, 440-441 [34 Cal.Rptr.2d 520], original italics.)

██ The medical care benefit amounts Teresa disputes, for which she seeks to hold Aetna responsible, were in fact paid, if at all, by Yucaipa, and not by Aetna. Thus, Aetna's cross-complaint can make no genuine claim against Yucaipa for contribution or other equitable division of benefits Aetna overpaid.

Thus, the claims which are subject to Aetna's cross-complaint here consist solely of noneconomic damages: i.e., emotional distress damages.

b. *Aetna's Liability for Noneconomic Damages Is Several Only*

Although we have found no case precisely on point, we find *Hoch* v. *Allied-Signal, Inc.* (1994) 24 Cal.App.4th 48 [29 Cal.Rptr.2d 615], clear and instructive in its application of Civil Code section 1431.2. There, the decedent was killed in a single-car accident. At issue was whether her seat belt had failed. The decedent's survivors brought a wrongful death action against Ford, the automobile manufacturer, and against the seat belt manufacturer, on theories of negligence and strict product liability. The plaintiffs settled

with Ford before trial. The matter went to trial against the seat belt manufacturer. The jury found Ford 45 percent at fault, the decedent 20 percent at fault, and the seat belt manufacturer 35 percent at fault.

The plaintiffs did not claim any economic damages; by stipulation the damages were "deemed purely noneconomic." (*Hoch* v. *Allied-Signal, Inc.,* *supra*, 24 Cal.App.4th 48, 62.) The jury found the plaintiffs' total damages to be $500,000. Ford's pretrial settlement was for $382,500. The court entered judgment against the seat belt manufacturer for $175,000, or 35 percent of $500,000. (*Ibid.*)

The seat belt manufacturer sought to reduce the judgment to $17,500: $500,000 reduced by $100,000, representing the decedent's 20 percent fault, and the remaining $400,000 offset by the dollar amount ($382,500) of Ford's settlement, which had been adjudicated a good faith settlement under Code of Civil Procedure section 877, subdivision (a).

The *Hoch* court rejected the seat belt manufacturer's claim for offset of the good faith settlement. Under Code of Civil Procedure section 877, a "good faith" settlement by "one or more of a number of tortfeasors *claimed to be liable for the same tort*" (italics added) does not discharge the liability of the nonsettling tortfeasors, "but it shall reduce the claims against the others in the amount stipulated by the release . . . or in the amount of consideration paid for it . . . ." (Code Civ. Proc., § 877, subd. (a).)

Normally, each concurrent tortfeasor is "personally liable for any indivisible injury of which his negligence is a proximate cause." (*American Motorcycle Assn.* v. *Superior Court, supra*, 20 Cal.3d 578, 586.) This liability is based on the theory that ". . . a tortfeasor is liable for any injury of which his negligence is *a* proximate cause. Liability attaches to a concurrent tortfeasor in this situation not because he is responsible for the acts of other independent tortfeasors who may also have caused the injury, but because he is responsible for all damage of which his own negligence was a proximate cause." (*Id.* at p. 587.) Such liability amounts to joint and several liability for a single, indivisible injury. Under former tort doctrines, the courts "could not conceive of allocating liability. Injuries were considered indivisible; therefore, a settling defendant could only offer to pay for the whole injury, not just his part." (*Duncan* v. *Cessna Aircraft Co.* (Tex. 1984) 665 S.W.2d 414, 431.)

Now, however, even though multiple tortfeasors may have caused an otherwise indivisible injury, joint and several liability is no longer the rule for noneconomic damages. Again, *Hoch* v. *Allied-Signal, Inc., supra*, 24

Cal.App.4th 48, provides explication: "Although decedent's death is, literally, a single injury, the noneconomic harm caused plaintiffs *is not indivisible*; rather, by virtue of section 1431.2(a), *it must be divided* among the multiple tortfeasors according to their shares of fault." (*Id.* at p. 67, italics added.) The *Hoch* court held there was no right to setoff under Code of Civil Procedure section 877, subdivision (a), because the two tortfeasors were no longer, by definition, joint tortfeasors. Thus, where only noneconomic damages are at stake, a plaintiff could not "claim[]" multiple tortfeasors were "liable for the same tort." (Code Civ. Proc., § 877, subd. (a).) "Under the scheme of purely several liability created by section 1431.2(a), however, '. . . a personal injury plaintiff's valid "claim" against one such tortfeasor for noneconomic damages can never be the liability of "the others." . . . Thus, there is no longer any such claim "against the others" to "reduce." ' (*Espinoza* v. *Machonga* [(1992)] 9 Cal.App.4th [268,] 274-275 [11 Cal.Rptr.2d 498].)" (*Hoch* v. *Allied-Signal, Inc., supra*, 24 Cal.App.4th 48, 63.)

Instead, "pursuant to section 1431.2(a), the noneconomic damages for which the settling and nonsettling defendants could be claimed liable were, *by law*, separate and distinct, allocated according to the defendants' individual fault." (*Hoch* v. *Allied-Signal, Inc., supra*, 24 Cal.App.4th 48, 64, italics in original.)

■ Here, as in *Hoch*, the damages at issue are purely noneconomic. Accordingly, *Hoch* teaches that Aetna and Yucaipa cannot, under these circumstances, be joint tortfeasors. "Joint and several liability" is a term of art; the statement that multiple or concurrent tortfeasors shall have only several and not joint liability for noneconomic damages has a specific meaning which renders such tortfeasors no longer joint tortfeasors.

Civil Code section 1431.2 means that Aetna's liability to Teresa is several only, and can only be based upon a finding of Aetna's individual proportion of fault. Thus, it must be open to Aetna at trial in the underlying action to bring in evidence of Yucaipa's, and any other potentially liable actor's, proportion of fault in causing Teresa's noneconomic damages. For example, Yucaipa has apparently never disputed that it had accepted liability to pay for David's last surgery and treatment at St. John's before care was given and the bills incurred. If, as Teresa alleges, she suffered severe emotional distress on account of outstanding unpaid bills upon David's death, the jury must be properly instructed how to allocate fault for that damage between Aetna and Yucaipa. A jury could find that, even if Aetna had wrongly denied coverage, and therefore denied payment, Yucaipa had promised to pay, such

that there should not have been any delay to cause Teresa worry and distress. In addition, if Teresa at all times had received Yucaipa's assurances of payment and she was not truly in financial difficulty, or if she acquiesced in or instigated the delay in payment, the jury may question whether she indeed suffered the degree of emotional distress claimed.

Other allegations of misconduct appear to relate solely to Aetna's conduct. Among other things, Teresa has alleged that the delays in Aetna's approval process caused David to lose windows of opportunity for life-saving treatment, and ultimately hastened his death or prevented him from living as long or as well as he otherwise might have done. Aetna has not argued that any other actor should bear a proportion of fault for noneconomic damages arising from the allegedly wrongful delays and denials of approval for treatment.

In sum, although the bare allegations of Teresa's complaint appear to encompass some conduct for which others, besides Aetna, might have responsibility, the complaint only seeks damages either covered by contract or noneconomic damages.

Aetna's liability under its contract is governed by contract terms, and the coordination of benefits between Aetna's and Yucaipa's several contracts is also contract based. Aetna is not claiming contribution for the economic damages (medical bills), which Yucaipa in fact paid.

Aetna's liability for noneconomic damages is, by statute, several only. Teresa may recover only against Aetna for damages in proportion to Aetna's comparative fault. Aetna must be permitted to prove that others may bear a proportion of liability for the noneconomic damages, and the jury must be instructed to make findings on the allocation of fault, so as to assess against Aetna only those damages attributable to its several fault. The jury findings must include an assessment of Yucaipa's proportion of fault, if any.

Because Teresa may only recover from Aetna for that increment of noneconomic damages in proportion to Aetna's several fault, Aetna cannot maintain a claim that it may be held responsible to pay Teresa for damages properly attributable to Yucaipa. There is, therefore, no basis in law for Aetna to maintain any claim for equitable contribution or indemnity from Yucaipa. It will be up to Teresa to recover from Yucaipa separately for Yucaipa's share of noneconomic damages.

We conclude that the trial court properly found Yucaipa's showing in support of the motion established that Yucaipa was entitled to a judgment in its favor as a matter of law.

## IV. *Step Three—Aetna Has Not Negated Yucaipa's Showing*

The arguments below and on appeal present issues of law. Aetna's argument focuses upon its interpretation of the controlling issues of law. Consequently, Aetna has not attempted to, and cannot, demonstrate that a material triable issue of fact may be raised to negate Yucaipa's prima facie case for judgment in its favor.

### DISPOSITION

Solely noneconomic damages are at stake in the underlying action. Pursuant to Civil Code section 1431.2, Aetna's and Yucaipa's liability for such damages is several only; they are not joint tortfeasors notwithstanding that their concurrent conduct may have contributed to an otherwise indivisible injury. By law, noneconomic damages must be divided in proportion to fault. The trial court correctly ruled that, as a matter of law, Aetna could not be held liable in the underlying action for any increment of damages not attributable to its own proportion of fault. Thus, Aetna was not to be held to pay any moneys attributable to Yucaipa's fault, and could have no claim for equitable contribution or indemnity against Yucaipa. Aetna must be permitted to show in the underlying action, however, that it may not have been solely responsible for the damages claimed, and the jury must be instructed to find the proportionate fault of each actor.

The judgment is affirmed.

Hollenhorst, Acting P. J., and Gaut J., concurred.